HARLEM HOSPITAL CENTER MEDICAL BOARD et al., Respondents, v JOSEPH HOFFMAN, as President of Health and Hospitals Corporation, et al., Appellants.

First Department, January 14, 1982

### APPEARANCES OF COUNSEL

*June A. Witterschein* of counsel (*Stephen J. McGrath* with her on the brief; *Allen G. Schwartz, Corporation Counsel,* attorney), for Joseph Hoffman, appellant.

*Michael F. Tietz* of counsel (*Judith A. Gordon* with him on the brief; *Robert Abrams, Attorney-General* and *George D. Zuckerman,* attorneys), for Richard Berman, appellant.

*Ava Karen Atkinson* for respondents.

### OPINION OF THE COURT

Ross, J.

This appeal poses the question whether the Director of the New York State Office of Health Systems Management (OHSM), has the authority pursuant to the Public Health Law, to order the removal of an acting executive director of

a hospital center which is operated by the Health and Hospitals Corporation of the City of New York. Special Term found that the State lacked this power and ordered the reinstatement of petitioner Albert Jackson. We disagree and now reverse that judgment.

In 1969, the New York State Legislature recognized that there were "inadequate general and specialized health care facilities" (New York City Health and Hospitals Corporation Act [L 1969, ch 1016], § 2) in the City of New York. To combat this situation the Legislature created a public benefit corporation to be known as the New York City Health and Hospitals Corporation (HHC). This corporation was formed to provide an essential public and governmental function — the "delivery of comprehensive care and treatment of the ill and infirm, both physical and mental" (New York City Health and Hospitals Corporation Act, § 2). HHC was also provided with the authority: "[t]o employ officers, executives, management personnel, and such other employees who formulate or participate in the formulation of the plans, policies, aims, standards, or who administer, manage or operate the corporation and its hospitals or health facilities, *** fix their qualifications and prescribe their duties and other terms of employment" (New York City Health and Hospitals Corporation Act, § 5, subd 11).

Petitioner Albert Jackson, a retired New York City detective and a law school graduate, was employed by the HHC in January, 1978, as inspector general. He held this title for the 1978 calendar year and in this capacity was responsible for the investigative activities for the 17 municipal hospitals under the jurisdiction of the corporation. He was, thereafter, promoted to vice-president for personnel and labor relations. Petitioner was engaged in this assignment for a six-month period, from January to June, 1979. His responsibilities in that position included the formulation and implementation of corporate-wide personnel policies.

On June 12, 1979, Joseph Hoffman, then president of HHC, directed that an interim management team be sent to Harlem Hospital Center for the purpose of managing the hospital until a qualified executive director could be ap-

pointed to assume those duties. Petitioner was assigned to head that team. There was testimony presented to indicate that petitioner personally requested this assignment. The hospital, to which this team was dispatched, is an acute care facility with a bed capacity of 850 and a payroll of approximately 3,300 employees. When the management team arrived at Harlem Hospital, they immediately determined that various deep-seated problems existed. For example, there was a serious morale problem among the employees; there was a shortage of nurses; many employees often arrived late or were frequently absent and there was evidence of an unwarranted intervention by local community members. It was concluded that most of these problems were caused directly or indirectly by the fact that the hospital had been subjected to constant changes in management. Before the appointment of petitioner, there were eight prior executive directors assigned to this post over a 10-year period.

Three days after petitioner assumed his duties, the Department of Health — Office of Health Systems Management (OHSM), became aware of the change in directors at Harlem Hospital. On June 20, the State Director of the Hospital Program for the New York City area wrote to respondent Hoffman, the president of HHC, requesting that a copy of the "curriculum vitae" of the newly appointed chief executive officer of Harlem Hospital be forwarded to the State. Under article 28 of the Public Health Law, the Department of Health has the duty to regulate all hospitals in the State and is given broad authority to carry out this mandate. The purpose and intent of article 28 was declared to be: "Hospital and related services including health-related service of the highest quality, efficiently provided and properly utilized at a reasonable cost, are of vital concern to the public health. In order to provide for the protection and promotion of the health of the inhabitants of the state * * * *the department of health shall have the central, comprehensive responsibility for the development and administration of the state's policy with respect to hospital and related services, and all public and private institutions, whether state, county, municipal, incorporated or not incorporated * * * shall be subject to the provisions*

*of this article."* (Public Health Law, § 2800, emphasis supplied.) In addition, the Department of Health was granted the authority to promulgate rules and regulations to implement the provisions of the above-quoted statute. Pursuant to this authority, the department enacted certain regulations pertaining to hospitals and hospital administrators. It is the applicability of the regulation establishing minimum qualifications for hospital administrators which is the subject of this appeal.

The Department of Health, pursuant to 10 NYCRR 405.1021 (f), sought to review the qualifications of petitioner. This section provides:

*"Standard; qualified hospital administrator.* The governing body appoints a qualified hospital administrator or other chief executive officer. The factors explaining the standard are as follows:

"(1) the administrator has had actual experience of a suitable kind, nature and duration in hospital administration; or,

"(2) preferably the administrator has had formal training in a graduate program in hospital administration approved for membership in the Association of University Programs in Hospital Administration."

It was not until July 11 that the State became aware that Albert Jackson was the individual heading the hospital. On that date, during a routine visit to Harlem Hospital, a hospital administrator consultant employed by the State learned that petitioner was the acting chief executive officer at the hospital. Six days later the requested resumé was forwarded to the Department of Health and it was determined, almost immediately, that petitioner failed to meet the minimum qualifications for a hospital administrator. This determination was transmitted to Jack Koretsky, the executive vice-president — HHC, who requested that any action be delayed until August 1. On that date a search committee, which had previously been established to locate a permanent director for Harlem Hospital, was scheduled to meet. However, no decision was rendered by the committee at that time.

On August 2, official notification was forwarded to the executive vice-president — HHC, that petitioner was not qualified to hold the position of acting chief executive officer. The Department of Health urged HHC to immediately appoint a qualified person to run this hospital. No response to this letter was forthcoming. In a follow up letter of August 27, the State once again implored HHC to appoint a qualified executive. For the first time HHC was informed that failure to make such appointment will result in Harlem Hospital Center being "placed on the Problem Hospital List." Such a designation would "negate *** a facility's ability to have applications for construction considered under provisions of Article 28 unless they are submitted to correct deficiencies." Apparently, Harlem Hospital had previously submitted an application for a $300,000 Federal energy grant and, if a qualified administrator was not timely appointed, this grant would not be forthcoming.

On August 29, HHC's executive vice-president responded to the above two letters stating that the best available official is at Harlem Hospital. However, this same letter recites that the president of HHC has appealed to the State "for an exception which would make [petitioner] eligible for potential appointment as the permanent Executive Director." Apparently, at this time HHC was also of the opinion that petitioner's qualifications did not meet the required standards. Nevertheless, the Department of Health was steadfast in its determination that Jackson was not qualified. In a letter of September 7, HHC was given until October 1, to make a proper appointment.

In the meantime, HHC continued to assure petitioner that he met all applicable criteria and that the State did not have the authority to challenge his qualifications. As events would unfold, a qualified director was not appointed by the deadline established by the Department of Health. In fact, petitioner was formally appointed the acting executive director of Harlem Hospital on October 26. Three days thereafter, he resigned from his position as vice-president for personnel and labor relations. HHC officials were convinced that the requirements of the Public Health Law and their own rules and regulations were sufficiently flexible

to permit this appointment. In this respect, the testimony of Joseph R. Erazo, general counsel — HHC, which was rendered during a hearing on the issue of the petitioner medical board's standing to commence this action, is enlightening. Counsel testified that both he and the president of HHC were of the opinion that Jackson met the requirements of the Department of Health. In fact, HHC voluntarily chose to ignore the inquiries by the State concerning Jackson's qualifications.

Jackson also had an opportunity to detail his recollection of the facts. Petitioner testified that there was an agreement that he would remain as acting executive director for a period of six months. He was to resign from his position as vice-president for personnel and labor relations and, if his name was submitted by the search committee as a candidate, he would then be selected as the permanent chief executive officer. However, Joseph Hoffman, the president of HHC, did not remember that a six-month commitment had been made. It was Hoffman's recollection that this six-month period related to the time needed for the search committee to complete its task. In addition, an employment contract for a specific period of time had never before been entered into between HHC and one of its employees. Petitioner in his capacity as vice-president for personnel knew, or at least should have known, that such an agreement had never been previously consummated.

The communications between the concerned parties culminated on November 12, when OHSM served on HHC a notice of hearing and statement of charges. It was alleged that HHC had violated the Public Health Law and the rules promulgated thereunder by not appointing a qualified hospital administrator or other chief executive officer for Harlem Hospital, as required by 10 NYCRR 405.1021 (f). The scheduled hearings spanned two days — December 6, 1979, and January 31, 1980. On February 25, 1980, the hearing officer rendered his report. It was this officer's conclusion that Harlem Hospital was subject to the provisions of article 28 of the Public Health Law. In addition, he found that petitioner failed to meet the established standards of 10 NYCRR 405.1021 (f). The hearing officer recommended that the State issue an order directing that

Jackson be replaced as executive director and, unless a qualified executive director be appointed within 90 days, a $1,000 penalty be assessed against HHC.

On February 27, the Director of OHSM adopted these findings and conclusions and issued an order directing that "Albert Jackson be removed forthwith from the position of Executive Director of Harlem Center Hospital". This order also imposed the conditional fine. Two days thereafter, HHC notified Jackson that he was being removed from his position as a result of "an adverse determination by the State Department of Health as to your qualifications". It is also interesting to note that on February 29, the same day that petitioner received his notification, the State forwarded a letter confirming the award of the $300,000 Federal energy grant.

Upon petitioner's removal, he was reassigned within HHC as a special assistant to a corporate officer, with no decrease in salary. However, Jackson requested, and was granted, a leave of two weeks duration. A second request for additional leave was likewise granted. When petitioner returned in March, 1980, he indicated a preference to work in hospital administration rather than in an office environment. Joseph Hoffman, as president of HHC, informed Jackson that he could not appoint him to a deputy executive director position at a hospital, since it was the policy to permit the executive directors at the hospitals to select their deputies. On March 28, 1980, petitioner again met with Hoffman and advised the latter that he would resign from HHC upon expiration of the leave.

Thereafter, the instant CPLR article 78 proceeding was commenced which culminated in the judgment now under review. This judgment determined that the order of removal issued by the Department of Health is a nullity; that HHC is empowered to determine the qualifications of its employees; that OHSM has no legal authority "to establish or review the qualifications of employees of [HHC]" and ordered that Jackson be reinstated and be considered for the position of executive director of Harlem Hospital Center.

We cannot concur in the determination of the court at Special Term and conclude that the Department of Health

is empowered to establish and review the qualifications of employees of the Health and Hospitals Corporation of the City of New York.

The Public Health Law and the legislation creating the HHC recognize the importance of maintaining the best health care facilities for the residents of this State. The aim and purpose of both laws is to provide quality medical care and to regulate the provider of these services. The subject matter is the same, the only difference being the scope to which the individual enactments apply. The latter legislation creating the HHC is limited to those municipal hospitals operated by HHC. However, the regulations under the Public Health Law have State-wide application. All institutions, public and private, "whether state, county, municipal, incorporated or not incorporated * * * shall be subject to the provisions of this article" (Public Health Law, § 2800). No exceptions have been created. By its ruling, Special Term has created an exception where none was intended. We cannot now sanction this untoward result.

The Public Health Law authorized the Department of Health to establish a series of rules and regulations as a guideline. Pursuant to this grant, the department defined the standards a hospital administrator should meet. In addition, the Commissioner of the Department of Health has the power "to inquire into the operation of hospitals and to conduct periodic inspections of facilities with respect to * * * equipment, personnel, rules and by-laws" (Public Health Law, § 2803, subd 1, par [a]). The State in the exercise of its authority determined that petitioner's one year of service as inspector general for HHC and his six-month tenure as vice-president for personnel and labor relations was not "of a suitable kind, nature and duration in hospital administration" nor did he possess the neces-. sary educational credentials to qualify as the chief executive officer of a hospital (10 NYCRR 405.1021 [f] [1]).

If this appeal was merely limited to consideration of these regulations, our task would be simplified. However, the Legislature also gave power to HHC "[t]o employ officers, executives, management personnel [and to] * * * fix their qualifications" (New York City Health and Hospi-

tals Corporation Act, § 5, subd 11). This law also provides that "Insofar as the provisions of this act are inconsistent with the provisions of any other law * * * this act shall be controlling" (New York City Health and Hospitals Corporation Act, § 24). Since both legislative documents, the Public Health Law and the New York City Health and Hospitals Corporation Act, deal with an identical subject matter, these statutes are considered to be *in pari materia*. It is, therefore, incumbent upon this court to construe these enactments as if both formed a part and parcel of the same statute (56 NY Jur, Statutes, § 197).

It is unlikely that the Legislature intended to create a corporation which would be free from supervision by the State in such a vital area as the health field. To understand the rationale for creating the HHC, we must focus our attention on the legislative intent behind these statutes because standing alone they provide only limited assistance.

The legislation creating the HHC was introduced at the behest of the Mayor of the City of New York. This act was intended to remedy the then existing problems in city run hospitals. The most pressing problem, as detailed by Senator Norman Lent, one of the sponsors of this bill, during the New York Senate floor debate, was: "[T]he present primary problem in New York City municipal hospitals is substandard quality due primarily * * * to inadequate upkeep of physical facilities, insufficient supplies, obsolete and insufficient equipment * * * insufficient funds and rigidity in legal and administrative procedures which impede prompt decisions and prompt implementation of decisions * * * the New York City hospital system is impeded by too much red tape" (see remarks of Senator Norman Lent in support of Senate Bill No. 5301-A). In order to untangle this bureaucratic rigidity, the Legislature created a separate public benefit corporation which was to be free from control by city authorities but not free from the watchful eye of the State. In fact, the then Mayor of the City of New York, John Lindsay, wrote to the then Governor, Nelson Rockefeller, that the "corporation would be * * * subject to all pertinent New York State laws affecting the operation and construction of health facilities." These remarks were ech-

oed by Senator William Conklin, a member of the Joint Legislative Committee on Health, during the Senate debate on this bill (see remarks of Senator William Conklin in support of Senate Bill No. 5301-A).

It is evident that HHC was created to remedy a situation unique to the City of New York and the corporation was not created to operate outside the regulatory framework of the Public Health Law. The Legislature, although establishing a separate corporation, did not intend that entity to be operated separate and apart from and unfettered by State controls. The system of hospitals operated by HHC forms an integral part of the over-all State system and is subject to all State regulations.* The Department of Health's power to set standards for minimum qualifications, is not inconsistent with such scheme. The Department of Health, as the expert, clearly has the power to establish employment criteria and HHC has the authority to appoint within this structure unencumbered by New York City governmental "red tape". The powers granted by the Legislature to HHC complement the Public Health Law, but under no circumstance can they be deemed to supplant the regulatory framework established by the State. Pursuant to the declared public policy of the State, the Department of Health has over-all and comprehensive responsibility for the administration of these hospitals.

Other indices exist to support the conclusion that those hospitals under the jurisdiction of HHC are subject to the Public Health Law. Indeed the affiliation agreement between HHC and Harlem Hospital recognizes the jurisdiction of the State since it is there stated that the corporation will be responsible for and administer the hospital according to all New York State laws, rules and regulations. Further, the hospital is required to provide contract services in accordance with all applicable New York State laws. Medical records must be maintained pursuant to State laws, the hospital must comply with State regulations to obtain third-party benefits and the hospital shall participate in periodic audits conducted by the State (see,

---

\* In fact, petitioner Jackson conceded that HHC has total authority to hire and discharge at will, but argues that in this instance HHC acted under duress from the State of New York.

also, New York City Health and Hospitals Corporation Act, § 4, subd 9). In addition, Harlem Hospital and all other hospitals affiliated with HHC are licensed and granted an operating certificate pursuant to article 28 of the Public Health Law. Surely, the officers of the Health and Hospitals Corporation knew that the operations of the corporation were subject to scrutiny by the State.

The prior course of conduct of HHC demonstrates that the corporation was aware that it is subject to control by the State. Subdivision 6 of section 4 of the New York City Health and Hospitals Corporation Act provides that HHC "shall receive direct payments, including payments made by a social services district under title eleven of article five of the social services law, and the New York state medical assistance plan adopted thereunder". When HHC volunteered to participate in the State's Medicaid program, the corporation acknowledged and accepted the State's jurisdiction. By participating in this program, HHC became subject to title 11 of the Social Services Law, which provides in pertinent part:

"the responsibility for establishing and maintaining standards for medical care and eligibility shall be as follows * * *

"The department of health shall be responsible for

"(a) establishing and maintaining standards for all hospital and related services pursuant to article twenty-eight of the public health law" (Social Services Law, § 364, subd 2, par [a]).

Additionally, the application for the energy grant, which was jeopardized by having an unqualified director heading Harlem Hospital, was made pursuant to the Public Health Law. Knowledge that the corporation was acting outside the scope of permissible regulations can be gleaned from the August 29 letter where the executive vice-president of HHC requests an exception for the appointment of petitioner Albert Jackson. The only possible inference is that the corporation knew Jackson failed to meet State requirements and was seeking to avoid the foreseeable result.

Accordingly, the judgment of Supreme Court, New York County (SINCLAIR, J.), entered on March 18, 1981, which,

*inter alia,* declared respondents' order of February 27, 1980 a nullity, directed that petitioner Albert Jackson be reinstated to the position of acting executive director of Harlem Hospital Center and directed that the Health and Hospitals Corporation is empowered to determine the qualifications of its employees, should be reversed, on the law, without costs or disbursements, the petition dismissed and respondents' order of February 27, 1980, reinstated.

SULLIVAN, J. P., LUPIANO, BLOOM and FEIN, JJ., concur.

Judgment, Supreme Court, New York County, entered on March 18, 1981, unanimously reversed, on the law, without costs and without disbursements, the petition dismissed and respondents' order of February 27, 1980 reinstated.